# DISTRICT COURT OF THE VIRGIN ISLANDS
# DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:20-cr-0049 |
| ) | |
| **JORGE ROMERO-AMARO, GIOVANNI** ) | |
| **GRACIANI, HECTOR RIVERA CONCEPCION,** ) | |
| **RUBEN REYES, and PEDRO LUIS SAYAN** ) | |
| **VILLANUEVA,** ) | |
| ) | |
| Defendants. ) | |
| ) | |

**APPEARANCES:**

**Delia Smith, United States Attorney**
**Juan Albino, AUSA**
United States Attorney's Office
St. Thomas, U.S. Virgin Islands
 *For the United States of America*,

**Francisco J. Adams-Quesada, Esq.**
Law Offices of Francisco J. Adams-Quesada
San Juan, Puerto-Rico
 *For Defendant Jorge Romero-Amaro*,

**Saam Zangeneh. Esq.**
Law Offices of Saam Zangeneh
Miami, Florida
 *For Defendant Giovanni Graciani*,

**Juan Matos-de Juan, Esq.**
Matos-de Juan Law Office
San Juan, Puerto Rico
 *For Hector Rivera Concepcion*,

**Terri Griffiths, Esq.**
Griffiths Law
St. Thomas, U.S. Virgin Islands
 *For Defendant Ruben Reyes*,

**Carl R. Williams, Esq.**
SmithWilliams, PLLC
St. Thomas, U.S. Virgin Islands
    *For Defendant Pedro Luis Sayan Villanueva.*

## MEMORANDUM OPINION

**MOLLOY,** *Chief Judge*

**THIS MATTER** comes before the Court on Defendant Jorge Romero-Amaro's *Motion to Suppress Evidence*, filed on February 10, 2021 and Defendant Hector Rivera Conception's *Notice of Join[d]er of Motions*, filed on February 17, 2021. (ECF Nos. 90 and 106.) Romero-Amaro moves to suppress the fact of the interdiction, as well as the arrest, searches, and seizures of the fruits of the interdiction that took place on November 18, 2020, as illegal "without probable cause or reasonable suspicion." *Id.* at 6. The Court held an evidentiary hearing on February 11, 2022.[1] For the reasons stated below, the Court will deny the motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On November 18, 2020, at approximately 6:30 p.m., Customs and Border Patrol ("CBP") Joint Terrorism Task Force Agent Luis Roberto Capestany ("Agent Capestany") received a call from his FBI informant who indicated that a maritime smuggling operation was going to occur between the island of Culebra, off the coast of Puerto Rico, and St. Thomas in the U.S. Virgin Islands. The source stated that a vessel would come to St. Thomas from Culebra, pick up suspected contraband and then return to Culebra the same day. In response, Agent Capestany alerted the relevant agencies and interagency task forces, including the Air Marine Operations ("AMO") center on St. Thomas.

---

[1] During the evidentiary hearing on the motion, held on February 11, 2022, the Government offered the testimony of two (2) witnesses: Customs and Border Protection ("CBP"), Air Marine Operations, Marine Interdiction Agent Eric Vaughan ("Agent Vaughan") and CBP Joint Terrorism Task Force Agent Luis Roberto Capestany ("Agent Capestany"), who was assigned to the Radar Sector Intelligence Unit, Federal Bureau of Investigation ("FBI"), San Juan Division. The Government entered into evidence the following exhibits during the hearing; two (2) navigational charts of the waters around the islands of St. Thomas and Puerto Rico (Exs. 1 and 2); a photograph from the rear of Romero-Amaro's vessel showing the Defendants onboard (Ex. 3); a photograph of the five Defendants transported to St. Thomas on board the MIKE 843 (Ex. 4); a photograph of some of the blue and black duffle bags that were recovered from the water (Ex. 5); and Defendant Romero-Amaro's certificate of registration for the vessel (Ex. 6).

*United States v. Romero-Amaro et al.*
Case No.: 3:20-cr-0049
Memorandum Opinion
Page **3** of **14**

At approximately 9:10 p.m. on the evening of November 18, 2020, this information was relayed to CBP Marine Interdiction Agent Eric Vaughan ("Agent Vaughan") by his supervisor, Agent Justin Frechette ("Agent Frechette") that a smuggling venture was going to occur that evening between St. Thomas and Puerto Rico. As a result, AMO launched a patrol vessel, "MIKE 843," from Long Bay at Yacht Haven Grand, St. Thomas, to perform a "border security patrol" with the goal of identifying any vessels that might be in the vicinity of the reported smuggling operation. Hr'g Tr. at 25:18 (ECF No. 179). On board were Agent Frechette, as the vessel commander; Agent Vaughan, as a tactical boarding officer; and Agent Kevin Florence ("Agent Florence"), as a technical boarding officer responsible for warning shots and marine disabling fire.

Agent Vaughan testified that as CBP agents, they had the authority to stop any vessel they came across, whether or not the vessel was doing anything that raised their suspicion.[2] *Id.* at 25:16-23; 40:13-23; 58:1-15. The agents headed west, past Hassel and Water Islands, and stopped at Brewer's Bay around 9:40 p.m., on the west end of St. Thomas, to search for vessels in the area.

Around 10:00 p.m., the agents detected a vessel through their use of radar and headed in its direction, ten-to-fifteen (10-15) minutes away, to intercept it so they could identify what they were seeing on the radar. Once they were in range, they were able to see the vessel by use of their night vision goggles and found that the vessel was operating without navigational lights. The vessel was in U.S. Customs waters off the western point of St. Thomas near Savana Island, heading towards Culebra, off the southern coast of Puerto Rico. The agents did not find any other vessels in the vicinity. Agent Vaughan testified that they would have stopped other boats as well, had there been any others in the area. *Id.* at 43:8-17.

---

[2] The United States Code provides in relevant part that:

> an officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters . . . and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof . . . and use all necessary force to compel compliance.

19 U.S.C. § 1581(a).

*United States v. Romero-Amaro et al.*
Case No.: 3:20-cr-0049
Memorandum Opinion
Page **4** of **14**

As the agents approached, Agent Frechette directed the MIKE 843 to the vessel's rear quarter, in the "target-assessment position," so they could "see what was going on on the boat, identify the make of the vessel, the design of the vessel, . . . how many people were on board, [and] what might have been on board." *Id.* at 27:21-28:2. From that vantage point, the agents could see that there were five (5) individuals (the Defendants) on board, three (3) of whom were on the rear bench. From the target-assessment position at the rear of the vessel, the agents were not able to see the registration number,[3] but they observed that the vessel was a "center-console-type vessel with twin outboard engines, [with] no T-top or sunshade on it," which raised the agents' suspicions. *Id.* at 28:18-22. Agent Vaughan testified at the hearing that, based on his experience intercepting twenty (20) to thirty (30) vessels, "a vessel that does not have a T-top or sunshade on it has had those removed in order to minimize their profile and visibility of the vessel by vis[ion] or radar." *Id.* at 29:9-12.

After observing the vessel, the agents turned on their navigational lights, blue law enforcement lights, and siren to identify themselves as law enforcement. Rather than stopping, the vessel proceeded forward. Because the vessel did not stop, the agents initiated their marine disabling procedures: first, Agent Vaughan shouted to alert the vessel that they were from the CBP and to tell those onboard to stop the vessel. When the vessel still did not stop, Agent Florence fired two warning rounds, after which the agents observed two individuals throwing objects overboard. Agent Vaughan shouted for them to stop, and he and Agent Florence then threw chem lights into the water to assist them with locating the jettisoned objects when they could return to the area. Even after hearing the two warning shots, the vessel continued on unabated. Consequently, Agent Frechette authorized Agent Florence to discharge marine disabling fire into the engine to disrupt its operation and force the vessel to stop. Agent Vaughan testified that use of disabling fire is the "authorized use of force" for compelling a vessel to stop. *Id.* at 35:11-12.

Once the vessel had come to a stop, Agents Vaughan and Florence ordered the Defendants to go to the front of the vessel so the agents could board the vessel safely and put

---

[3] Agent Vaughan testified that registration numbers are typically displayed either on the bow (front) or the stern (rear) of a vessel. Hr'g Tr. at 45:9-14 (ECF No. 179).

them under custodial arrest. The agents secured the individuals and waited approximately one hour for the U.S. Coast Guard ("USCG") and a CBP Black Hawk helicopter to arrive to assist the agents with recovering the jettisoned objects, during which time the Defendants remained in CBP custody. In all, law enforcement officers were able to recover seven duffle bags from the water. Agent Vaughan testified that, in his experience, "when targeted vessels, individuals on board, are throwing things overboard, they are trying to discard any evidence of a crime or smuggling." *Id.* at 34:11-14.

After the bags were retrieved, the CBP agents transported the Defendants to the Coast Guard dock in the MIKE 843, while the USCG transported the duffle bags and towed the vessel to the dock where the vessel was inspected. During the search, agents located the registration card for the vessel, which showed that the vessel was registered to Defendant Romero-Amaro. Also located on the vessel were night vision goggles and a flare gun.

The Defendants and the recovered bags were then turned over to Homeland Security Investigations ("HSI") for further investigation. A field test of the "bricks of suspected contraband" returned positive for cocaine. *Id.* at 94:18-22. There was no additional contraband found on the vessel itself. The vessel was not subjected to an ion scan to test for the presence of narcotics. *Id.* at 68:8-69L4.

On November 20, 2020, the United States (the "Government") commenced an action against the Defendants with a criminal complaint charging the Defendants with possession with intent to distribute cocaine. The Defendants made their initial appearance on even date. Thereafter, the Government returned a two-count bill of information, charging the Defendants with conspiracy to possess with intent to distribute cocaine (Count 1) and possession with intent to distribute cocaine (Count 2). (ECF No. 56.)

On March 18, 2021, a federal grand jury returned an indictment charging the Defendants with conspiracy to possess with intent to distribute (Count 1); possession with intent to distribute five (5) kilogram or more of cocaine (Count 2); conspiracy to possess with intent to distribute a controlled substance on board a vessel subject to the jurisdiction of the United States (Count 3); possession with intent to distribute a controlled substance on board a vessel subject to the jurisdiction of the United States (Count 4); and attempt to

destroy property subject to forfeiture (Count 6). In addition, Defendant Romero-Amaro was charged with failure to heave to (Count 5). (ECF No. 118.) The Defendants were arraigned on March 31, 2021.

Defendant Romero-Amaro filed the instant *Motion to Suppress Evidence* on February 10, 2021, arguing that the agents lacked either reasonable suspicion or probable cause to arrest, search, or seize Romero-Amaro or the vessel because he was not committing a crime in the presence of law enforcement and was, instead, peacefully navigating his boat, which was adequately identified. Romero-Amaro contends that—as a result—the fruit of the illegal arrest and search must be suppressed. (ECF No. 90.) Further, Romero-Amaro is challenging the stop of the vessel, itself, arguing that even the mention of the interdiction must be suppressed at trial.[4]

The Government filed an opposition on February 26, 2021. (ECF No. 112.) In closing arguments at the hearing, the Government responded that, first, the agents had authority to stop the vessel for a documents check under 19 U.S.C § 1581(a). Second, the agents had reasonable suspicion based on articulable facts to conduct a *Terry* stop of the vessel, and that, once the vessel was encountered, the reasonable suspicion was raised to probable cause by the Defendants' violation of federal laws, including operating a vessel without navigation lights and refusing multiple times to stop until CBP disabled its engine. Moreover, the agents witnessed individuals jettisoning objects overboard as the agents told the vessel to stop, strengthening probable cause to arrest those onboard the vessel. Lastly, the Government argues that the Defendants have no reasonable expectation of privacy in the abandoned duffle bags that they discarded from the vessel.

## II. LEGAL STANDARD

Defendant Romero-Amaro argues that the CBP agents had neither reasonable suspicion nor probable cause to stop, search, or seize the vessel nor to arrest him. The Fourth Amendment, guarantees in relevant part, "[t]he right of the people to be secure in their

---

[4] Defendant Reyes filed a *Motion to Suppress* on February 10, 2021. (ECF No. 91.) On February 17, 2021, Defendant Rivera Concepcion filed a *Notice of Join[d]er of Motions*, in which he joined Romero-Amaro's *Motion to Suppress*, ECF No. 90, and Reyes' *Motion to Suppress*, ECF No. 91. (ECF No. 106.) Thereafter, on February 8, 2022, Reyes filed a motion to withdraw his motion to suppress, ECF No. 91, which the Court granted. *See* ECF No. 170.

persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. Warrantless searches and seizures are *per se* unreasonable and therefore unconstitutional under the Fourth Amendment unless they qualify under an enumerated exception. *Missouri v. McNeely*, 569 U.S. 141, 148 (2013). Such exceptions include investigatory stops (often referred to as *Terry* stops), the automobile exception, and searches at sea.

### A. *Reasonable Suspicion and Investigatory Stops*

A brief investigatory stop, allowing an officer to stop a person for a limited time to question and conduct a non-intrusive search may be justified by a law enforcement officer's reasonable suspicion that an individual is or has been engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 28-31 (1968); *Navarette v. California*, 572 U.S. 393, 397-99 (2014); *United States v. Hensley* 469 U.S. 221, 232 (1985). Under an investigatory stop, any search must be limited to weapons and may not be extended to search for evidence of criminal activity. *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983); *Terry*, 392 U.S. at 29-30.

Reasonable suspicion exists where an officer can "point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Terry*, 392 U.S. at 21. Generalized suspicions and inarticulable hunches are insufficient to justify reasonable suspicion. *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020); *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). Reasonable suspicion must be adjudged under the totality of the circumstances test. *Navarette*, 572 U.S. at 395, 397; *Cortez*, 449 U.S. at 417.

Officers may rely on their own observations, information gathered from others, and inferences based on their professional experience to infer criminal activity from observed conduct. As such, courts adjudge the determinations of law enforcement officers with considerable deference. *United States v. Arvizu*, 534 U.S. 266, 277 (2002) (affirming a reasonable suspicion to stop based on the CPB agent's inference from his observations, registration check, and experience); *United States v. Jordan*, 952 F.3d 160, 166 (4th Cir. 2020) (finding reasonable suspicion based on the agent's practical experience that supported his inference that the defendant's activity was consistent with drug trafficking); *United States v.*

*Ojudun*, 915 F.3d 875, 879 (2d Cir. 2019) (finding reasonable suspicion—in part—because the veteran officer found suspicious the fact that the car and the driver were registered in different states and observed that the driver's appearance was consistent with that of a drug user).

When a brief investigatory stop exceeds the time needed to effectuate the purpose of the stop, it becomes a *de facto* arrest that requires probable cause. *See United States v. Sharpe*, 470 U.S. 675, 685-86 (1985). Nevertheless, the Supreme Court has declined to issue a bright-line rule as to when an investigatory stop becomes an arrest, preferring, instead, for courts to make such determinations based on 1) the diligence of the officers involved; 2) the degree to which the individuals' liberty is restrained; 3) and whether the officers transferred the individuals to another location during their detention. *See Id.* ("Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is reasonable, common sense and ordinary human experience must govern over rigid criteria."); *see, e.g.*, *United States v. Place*, 462 U.S. 696, 709-10 (1983) (finding a ninety-minute detention unreasonable based in part on the officers' lack of due diligence); *Lincoln v. Turner*, 874 F.3d 833, 841-42 (5th Cir. 2017) (explaining that the custodial arrest occurred when officers handcuffed the suspect and placed him in the police car for two hours); *United States v. Wrensford*, 866 F.3d 76, 87 (3d Cir. 2017) (finding the investigatory stop was converted to an arrest when the officers moved the suspects from the street to jail without any evidence that the officers did so for the safety of the suspects).

Moreover, reasonable suspicion may give rise to probable cause. *Arkansas v. Sullivan*, 532 U.S. 769, 771-72 (2001) (concluding that the allegedly pretextual stop was valid because probable cause existed once the defendant committed the traffic violation); *United States v. Favreau*, 886 F.3d 27, 116 (1st Cir. 2018) (explaining that the vehicle stop for unusual driving was valid even though the officers were initially interested in the defendant's possible involvement in drug trafficking).

### B. *Probable Cause for Warrantless Arrest, Search, and Seizure*

Probable cause that justifies an arrest without a warrant exists "if the facts and circumstances known to the arresting officer warrants a prudent man in believing that an

offense had been or was being committed." *Henry v. United States*, 361 U.S. 98, 102 (1959). Indeed, search warrants also are not required where officers have probable cause to believe a vehicle contains contraband or other evidence of criminal activity. *See, e.g.*, *California v. Carney*, 471 U.S. 386, 394-95 (1985) (finding no warrant required because officers had probable cause to believe the occupant was trafficking drugs).

The "automobile exception" is founded on the inherent mobility of vehicles and the attendant pervasive regulation, which reduces the owner's reasonable expectation of privacy. *See Carney*, 471 U.S. at 392 ("The public is fully aware that it is accorded less privacy in its automobiles because of [a] compelling governmental need for regulation."). This exception has been extended to include motor homes, trains, airplanes, and vessels such as boats. *E.g.*, *United States v. Vilches-Navarrete*, 523 F.3d 1, 13 (1st Cir. 2008) (finding a warrantless search of a cargo vessel valid because of the reduced expectation of privacy in a maritime setting); *United States v. Varlack Ventures*, 149 F.3d 212, 217 (3d Cir. 1998) ("'practically since the beginning of the government,' no warrant has been required for searched of ships 'because the [ship] can be quickly moved out of the locality or jurisdiction in which the warrant must be sought'") (quoting *Carroll v. United States*, 267 U.S. 132, 153 (1925); *United States v. Lauchli*, 724 F.2d 1279, 1282 (7th Cir. 1984) (affirming the warrantless search of a boat because it was readily mobile on the open waterway).

### III.  DISCUSSION

#### A. *The Agents had Probable Cause to Stop and Board the Vessel Because the Vessel was Operating in Violation of COLREGS Regulations.*

In his motion to suppress, Romero-Amaro argues that law enforcement agents had neither probable cause nor reasonable suspicion to intervene and stop the vessel because Romero-Amaro "was not committing any crime in the presence of the agents and was peacefully navigating on a boat adequately identified." (ECF No. 90 at 5-6.) The Court disagrees. Probable cause that justifies a warrantless arrest or seizure exists "if the facts and circumstances known to the arresting officer warrants a prudent man in believing that an offense had been or was being committed." *Henry*, 361 U.S. at 102.

Here, the agents had received information from their supervisor that a drug smuggling operation was to occur in the waters between the islands of St. Thomas and

Culebra. Consequently, they were charged with identifying any boats in that area. The agents located only one vessel in that vicinity in U.S. Customs waters, which they were able to observe only by use of their radar. After launching their MIKE 843 vessel to intervene, they observed through night vision goggles that the boat was not visible to the naked eye because it was operating without navigational lights—a violation of U.S.C.G. navigation rules under 33 C.F.R. § 83.22, which specify that power-driven vessels under 12 meters in length must display navigation lights between sunset and sunrise and during period of restricted visibility. *In re Mobro Marine, Inc.*, No. 3:02-cv-471-J-20-TEM, 2004 U.S. Dist. LEXIS 27561, at *55-57 (M.D. Fla. Dec. 20, 2004) ("As noted by the Eleventh Circuit Court of Appeals, 'the extreme blackness of water at night makes any departure from light rules one of the most [ ]recklessly unlawful acts a vessel can commit.'") The regulations found under 33 C.F.R. § 83, also known as the "72 COLREGS," apply to all U.S. territories and possessions, including the U.S. Virgin Islands and Puerto Rico. 33 CFR § 81.1 Special Note. Moreover, the violation of the COLREGS, much like a traffic violation on a road or highway, is punishable by a fine. 33 U.S.C. § 1608. Here, the vessel was operating in violation of a navigational law, and as such, was committing an offense. The agents therefore had probable cause to stop and board the vessel.

Further, an officer's subjective intention is not relevant to the analysis of the constitutionality of the stop under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 811-13 (1996) (finding the allegedly pretextual stop to be valid because the subjective intent of an office is irrelevant and probable cause objectively existed); *United States v. Wilson*, 960 F.3d 136, 145 (3d Cir. 2020) (holding that the traffic stop was valid even though the officers used the stop as pretext to investigate another crime) (*vacated on other grounds by* Nos. 18-1079, 19-1097, 2020 U.S. App. LEXIS 19476 (3d. Cir. June 23, 2020); *United States v. Fuehrer*, 844 F.3d 767, 772-73 (8th Cir. 2016) (finding vehicle stop for speeding violation to be valid even though the officer's motivation was to investigate for drugs); *United States v. Cash*, 733 F.3d 1264, 1265 (10th Cir. 2013) (stopping a vehicle for failure to come to a complete stop at a stop sign was found valid although the primary reason for the stop was to conduct a drug search). *But see United States v. Lewis*, 672 F.3d 232, 241 (3d Cir 2012) (holding the vehicle stop invalid because the officer made the stop before noticing the

illegally tinted windows of the vehicle).

### B. The Agents had Reasonable Suspicion to Stop the Vessel.

Even if the agents did not have probable cause to stop and board the vessel, the Court finds that the agents had reasonable suspicion to effectuate an investigatory stop. Reasonable suspicion exists where a law enforcement officer can point to articulable facts which, along with rational inferences from those facts, reasonably warrant the officer's intrusion. *Terry*, 392 U.S. at 21. Courts look to the totality of the circumstances to determine whether reasonable suspicion existed. *Navarette*, 572 U.S. at 395, 397; *Cortez*, 449 U.S. at 417.

Here, the agents were looking for a vessel that might be involved in drug trafficking in a particular region of U.S. Customs waters. They identified a vessel in the target region and found it to be operating without navigational lights. Although Romero-Amaro does not offer a rationale for the boat to be navigating without lights at night, he argues that that it is not uncommon for boats to travel between St. Thomas and Culebra, ECF No. 179 at 59:7-15, and that the vessel's presence in those waters cannot establish reasonable suspicion. Further, he argues that if the vessel operating without lights were the basis for the stop, the agents would have issued a citation for the violation, which they did not do. The Court does not agree. Notwithstanding that a citation could have been issued for the violation, a lack of citation does not invalidate the stop. *United States v. Smith*, 104 Fed. App'x 266, 273 (3d Cir. 2004) ("[T]he absence of traffic citations does not impair the validity of the traffic stop. . . . Once the police stopped [the defendant] and saw the gun, they were clearly justified in arresting him and seizing the weapon . . . .")

Moreover, when the agents got into range of the vessel, they saw that the vessel had no t-top or sunshade. Agent Vaughan testified that this is a common trait of drug traffickers, as the absence of a sunshade gives the boat a much lower profile that makes it harder to see. As such, its absence raised Agent Vaughan's suspicions. (ECF No. 179 at 28:18-22, 29:9-12.) *See Varlack Ventures*, 149 F.3d at 217 ("Reasonable suspicion must be based on specific articulable facts, together with rational inferences drawn from those facts, which reasonably

warrant suspicion of criminal activity. Law enforcement officers may subjectively assess those facts in light of their expertise.")

In response, Defendant Romero-Amaro argues that it is not illegal to operate a vessel without a sunshade or t-top and that it was also not unreasonable for a vessel to be operating without a sunshade at 10:00 at night. *Id.* at 39:19-21, 61:10-62:1. However, the assertion of an allegedly innocent reason for an activity does not discount a factor that may also indicate that criminal activity is afoot. *Navarette*, 572 U.S. at 403. Furthermore, several apparently innocent activities, taken together, may meet the reasonable suspicion standard when viewed collectively. *See United States v. Sokolow*, 490 U.S. 1, 3, 9 (1989) (concluding there was reasonable suspicion to stop because the defendant fit six (6) "innocent" characteristics of a drug courier, which, together, were not held to be indicative of innocent travel); *Arvizu*, 534 U.S. at 277 (upholding reasonable suspicion because the activity observed was unlikely to be that of a local resident, based on the officers' experience).

The Court finds Romero-Amaro's explanation of the absence of the t-top unconvincing in the totality of the circumstances and concludes that the agents reasonably articulated the facts and inferences they drew that raised reasonable suspicion to make an investigatory stop.

### C. *The Agents had Probable Cause to Conduct a Warrantless Arrest, Search, and Seizure after the Vessel Failed to Heave to when so Commanded, in Violation of Federal Law.*

Romero-Amaro contends that Defendants' detention was unreasonable in the totality of the circumstances. He bases his argument on the length of detention during the hour that agents waited for the USCG to arrive and conduct the recovery of the jettisoned duffle bags. Had the agents been acting on reasonable suspicion alone, and therefore were conducting an investigatory stop, the Court might be persuaded. The Court agrees with Romero-Amaro that "there must be facts and circumstances within the arresting officer's knowledge sufficient to show that the person being arrested had committed, was committing, or was about to commit a crime." (ECF No. 90 at 4) (citing *Glik v. Cunniffe*, 655 F.3d 78, 85-86 (1st Cir. 2011).

Pursuant to the U.S. Code, it is a crime to fail to heave to:

> (a) (1) It shall be unlawful for the master, operator, or the person in charge of a vessel of the United States, or a vessel subject to the jurisdiction of the United States, to knowingly fail to obey an order by an authorized Federal law enforcement officer to heave to that vessel.
> . . .
> (b) (1) Except as otherwise provided in this subsection, whoever knowingly violates subsection (a) shall be fined under this title or imprisoned for not more than 5 years, or both.

18 U.S.C. § 2237(a)(1), (b)(1).

Here, the agents witnessed Romero-Amaro, as operator of his own vessel, fail to heed the CBP agents' law enforcement lights and siren and continue to operate the boat in violation of federal law. Further, when the agents shouted for the vessel to stop, Romero-Amaro again ignored the command and continued to operate the boat. Even after two warning shots were fired, Romero-Amaro did not stop the boat, committing yet another felony. In fact, he only stopped the boat when Agent Florence disabled the engine by firing on it. (ECF No. 179 at 32:13-34:2.) Consequently, the arresting agents had sufficient knowledge, through their personal witness of crimes being committed, to arrest him upon boarding the vessel. *See Henry*, 361 U.S. at 102.

Likewise, under the automobile exception, the agents were justified in conducting a warrantless seizure and search of the vessel, based on the demonstrated ready mobility of the vessel in open waters and the probable cause that led the agents to believe the vessel contained contraband or other evidence of criminal activity. *See Lauchli*, 724 F.2d at 1282.

Moreover, while evading the agents, passengers aboard the vessel jettisoned objects from the boat, even after the agents shouted at them to stop throwing objects overboard. *Id.* at 33:10-20.) Agent Vaughan testified that, "in [his] experience, when targeted vessels, individuals on board are throwing things overboard, they are trying to discard any evidence of a crime or smuggling." *Id.* at 34:11-14. Romero-Amaro does not contest, and appears to concede that he has no standing to contest, seizure of the contents of the duffle bags jettisoned into the water from the vessel. The Court concurs. *See United States v. Tinoco*, 304 F.3d 1088, 1117 (11th Cir. 2002) ("The crew members . . . effectively abandoned the contraband and thus have no Fourth Amendment standing to challenge the seizure.") When considered in the totality of the circumstances, the abandonment of contraband further

*United States v. Romero-Amaro et al.*
Case No.: 3:20-cr-0049
Memorandum Opinion
Page **14** of **14**

supports the Court's finding of reasonable suspicion for the agents to stop and board the vessel. *See id.*

### IV.  CONCLUSION

For the reasons set forth above, the Court finds that the Government did not violate Romero-Amaro's, or any defendant's, Fourth Amendment rights because the agents had probable cause to stop and board the vessel based on the vessel operating in violation of federal regulations. Even if there were no probable cause to stop the vessel based on violation of regulations, the Court finds that under the totality of the circumstances, the agents had reasonable suspicion to effectuate an investigatory stop. Moreover, when the vessel did not heave to on command of the agents, their reasonable suspicion was elevated to probable cause for a warrantless arrest, search, and seizure.[5] The Court will therefore deny Romero-Amaro's motion to suppress evidence. An appropriate order follows.

**Dated:** August 8, 2022        */s/ Robert A. Molloy*
                                **ROBERT A. MOLLOY**
                                **Chief Judge**

---

[5] The Government argues that the USCG and CBP have an unrestrained right to stop and board any vessel in United States territorial waters pursuant to 19 U.S.C. § 1581(a). The Court finds it unnecessary to determine whether section 1581(a) provides an unfettered right in this instance based on the Court's finding that the agents had probable cause, or at a minimum reasonable suspicion, to effectuate a search and seizure.